IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>0.7151 BITCOIN (BTC) SEIZED FROM NEST SERVICES LIMITED d/b/a BINANCE ACCOUNT ENDING IN 5657,<br><br>52,472.485 TETHER (USDT) SEIZED FROM NEST SERVICES LIMITED d/b/a BINANCE ACCOUNT ENDING IN 5657,<br><br>0.6946 ETHEREUM (ETH) SEIZED FROM NEST SERVICES LIMITED d/b/a BINANCE ACCOUNT ENDING IN 5657,<br><br>1063.9684 XRP SEIZED FROM NEST SERVICES LIMITED d/b/a BINANCE ACCOUNT ENDING IN 5657,<br><br>Defendants. | Civil No. 8:26CV449<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the Defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

**Nature of the Action**

1. This is an action to forfeit property to the United States for violations of 18 U.S.C. § 981(a)(1)(A) and (C).

## The Defendant *in rem*

2. The Defendant property is all present and future interesting in the following property: 0.7151 Bitcoin (BTC) seized from Nest Services Limited d/b/a Binance account ending in 5657; 52,472.485 Tether (USDT) seized from Nest Services Limited d/b/a Binance account ending in 5657; 0.6946 Ethereum (ETH) seized from Nest Services Limited d/b/a Binance account ending in 5657; and 1063.9684 XRP seized from Nest Services Limited d/b/a Binance account ending in 5657 (hereinafter "Defendant Property")

3. The Federal Bureau of Investigation (FBI) seized the Defendant Property in the District of Nebraska pursuant to a federal seizure warrant that was signed on or about November 6, 2025, and subsequently executed on November 7, 2025.

4. The United States Marshal Service (USMS) currently has custody of the Defendant property.

## Jurisdiction and Venue

5. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

6. This Court has *in rem* jurisdiction over the Defendant property pursuant to 28 U.S.C. § 1355(b).

7. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b) and 1395 because acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for the Forfeiture

8. This action seeks the forfeiture of all right, title, and interest in the above-captioned property because the property constitutes or is derived from wire fraud in violation of 18 U.S.C. § 1343, and property involved in monetary transactions and money laundering in violation of 18 U.S.C. § 1956.

## Facts

*Background on Virtual Currencies and Transaction Analysis*

9. Virtual currency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer virtual currency from one person or place to another can be printed or written on a piece of paper or other tangible object. Virtual currency can be exchanged directly person to person, through a virtual currency exchange, or through other intermediaries.

10. Generally, virtual currency is not issued by any government, bank, or company. Instead, virtual currency is generated and controlled through computer software operating on a decentralized peer-to-peer network. Most virtual currencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Virtual currency is not illegal in the United States.

11. Bitcoin ("BTC") is a type of virtual currency. Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies that allow individuals to buy or sell virtual currencies in exchange for fiat currencies or other virtual currencies), bitcoin ATMs, or directly from other people. Individuals

can also acquire virtual currencies by "mining." An individual can "mine" bitcoins by using his or her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a virtual currency. Individuals can send and receive virtual currencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in virtual currency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And although bitcoin transactions are not completely anonymous, bitcoin does allow users to transfer funds more anonymously than traditional financial transactions.

12. Virtual currency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and then generate, store, or generate and store public and private keys used to send and receive virtual currency. A public key, or public address, is akin to a bank account number, and a private key, or private address, is akin to a PIN number or password that allows a user to access and transfer value associated with the public address or key.

13. To conduct transactions on a blockchain, an individual must use the public address as well as the private key. A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of a public address's private key can authorize any

transfers of virtual currency from that virtual currency public address to another virtual currency address.

14. Although virtual currencies such as bitcoin have legitimate uses, virtual currency is frequently used by individuals and organizations for criminal purposes, such as to pay for illegal goods and services – via, for example, hidden services websites operating on the Tor network.

15. Virtual currencies can also be used to engage in money laundering. By maintaining multiple wallets, those who use virtual currency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

16. Exchangers and users of virtual currencies store and transact their virtual currency in accounts commonly referred to as "wallets," which are essentially digital accounts. A virtual currency user can store and access wallet software in a variety of forms, including via:

- a PC or laptop ("desktop wallet"),
- a mobile application on a smartphone or tablet ("mobile wallet"),
- an Internet-based cloud storage provider ("online wallet"),
- an online account associated with a virtual currency exchange ("online account"),
- a tangible, external device, such as a USB thumb drive ("hardware wallet"), or
- printed public and private keys ("paper wallet").

17. Wallets can also be backed up via, for example, paper printouts, USB drives, or CDs. Wallets can be accessed through a password or a "recovery seed" or "mnemonic phrase," that is, random words strung together in a phrase.

18. Additional security safeguards for virtual currency wallets can include two-factor

authorization, such as a password and a phrase. I know that individuals possessing virtual currencies often have safeguards in place to prevent their assets from hacking, unauthorized transfer, and/or law enforcement seizure.

19. "Ethereum" is a cryptocurrency, or virtual currency, that utilizes a blockchain-based software program. Ethereum is the world's second-largest virtual currency by market capitalization, behind Bitcoin.

20. "TetherUS" (USDT), also referred to as "Tether", is a virtual currency purportedly backed by United States dollars. Tether was originally designed to always be worth $1, and the company responsible for issuing Tether purportedly maintained $1 in reserves for each Tether issued.

21. Virtual currency transactions can have multiple inputs and multiple outputs. While the ownership of any particular address or wallet can be anonymous, all transactions of virtual currencies are recorded on a "blockchain," which is a series of “blocks” of transactions that establishes a verifiable, transparent record of the movement of virtual currency. Blockchains in this context are viewable by the public-they show all transactions, but do not reflect who owns a particular address. As virtual currency transactions are processed, they are assigned a unique identifier on the blockchain called a transaction hash.

22. Virtual currency exchanges exist and operate similarly to fiat currency exchanges. Customers use these exchanges to trade one form of virtual currency for another, or to exchange virtual currency into fiat money. In my training, knowledge, and experience, fraudsters will use virtual currency exchanges to launder or obfuscate their illicit gains.

23. Based on his training and experience, FBI Special Agent Michael Schmitt (SA

Schmitt) knows that financial account information, including virtual currency wallets, is not typically shared across multiple, unrelated individuals. SA Schmitt knows from his training and experience that this shared use of information is very often the same person or a close and trusted group working in concert.

24. Based on SA Schmitt's training and experience, he knows that individuals engaged in criminal activity involving virtual currency frequently engage in "chain hopping," meaning that they convert funds from one virtual currency to another, in order to obscure the source of funds and make it more difficult to track illicit funds as they move from one blockchain to another. Within this investigation, some of the virtual currency transfers were conducted in this manner. BTC was swapped for USDT.

*Background on Binance*

25. Nest Services Limited ("Nest Services"), which is registered and domiciled in the Seychelles, owns and operates Binance.com ("Binance"), a virtual currency exchange that provides a platform for trading various virtual currencies and exchanging virtual currencies for fiat currencies. Binance is one of the largest virtual currency exchanges in the world based on its trading volume. Among other services, Binance maintains the private keys relating to the customer's virtual currency and therefore has complete control over client funds. Binance offers its services to customers around the world, including the United States.

26. Customers use exchanges like Binance to trade one form of virtual currency for another, such as exchanging Ethereum for other digital currencies or to exchange digital currencies into fiat money.

*Factual Basis*

27. Based on SA Schmitt's training and experience, he is aware that a common scheme to defraud victims is to complete an account takeover. In essence, the victim is tricked into providing account log in information in return for assistance in unlocking, or unfreezing, their account. The account is then taken over and all assets transferred before the account owner is given back access. In this process, fraudsters are withdrawing and further transferring assets beyond reach, leaving victims with no ability to get their money back.

28. Scheme participants mine the internet, for example, blockchain data sites and social media sites, in search of victims. The goal of the scammer is to initiate a discussion with the victim, attempting to deceive the victim that their crypto account is locked, or in need of assistance. The fraudster provides basic crypto information and publicly available data to deceive the victim in believing they are either an employee of said crypto company, or a third party that can assist. For example, in the instant matter, the fraudster claimed to be assistance provided by Coinbase, an online crypto site where the public can buy, sell, and store crypto. The fraud actor then refers the victim to a bogus website or app that looks authentic but is controlled by the scammer. The victims are encouraged to allow the fraudster access to their computer in order to unlock their account before all funds are lost. After control is given, the fraudster then transfers all account holdings before the victim regains control of the account. Once the holdings are transferred, the scammer either vanishes or advises the victim that the account has been unlocked.

29. On August 27, 2025, the Victim filed a complaint with FBI Omaha regarding a cryptocurrency defrauding scheme. Based on information gathered from victim reports and interviews, scammers used open-source information to determine the Victim had cryptocurrency

holdings in Coinbase. The Victim reported that they were in telephonic and email contact with Coinbase employees, multiple times in the days prior to being defrauded, in an attempt to unlock their account. The Victim stated they tried multiple times to utilize the forgot password and account unlocking procedures, located on the Coinbase website, with no success. The Victim was then notified by the platform's "customer service" team (which was the scammers) that the account was presently unavailable for some reason. The Victim was directed by the scammers on how to allow scammers access to the Victim's computer, via remote access app. To gain the Victim's trust, the scammers spoke of company policy and let the Victim believe the account would be frozen and all funds lost if access was not given so they could save the account. After access was granted, scammers conducted one transaction in the full account amount. After the transaction had occurred, access to the account was returned to the Victim.

30. The various communications between the people committing the fraud and the victims were made through interstate wire and constitute wire fraud, in violation of 18 U.S.C. § 1343, which is a Specified Unlawful Activity as defined by the relevant money laundering statutes, namely, 18 U.S.C. § 1956(c)(7)(A) (incorporating the offenses listed in 18 U.S.C. § 1961(d)).

31. FBI traced the movement of the virtual currency from the Victim. The tracing analysis showed that Victim virtual currency funded transfers to and between listed deposit addresses.

32. Per the email provided by the Victim, one BTC transfer totaling 1.5816 BTC was sent from their Coinbase account to deposit address bc1q7wg4563v9zgxk8wjx0r5847gtzkf3rxayxtafg ("bc1q7wg4…tafg") on August 27, 2025. On

the withdrawal date, this was equivalent to $177,166 USD. Per a public blockchain explorer, blockchain.com, this was the only deposit received by bc1q7wg4…tafg.

33. Per blockchain.com, the 1.5816 BTC was transferred to bc1qy3nl7npg5wc4ke89e2tr9jzt9g8pyd3upqac8d ("bc1qy3nl…ac8d") then comingled with other BTC deposits to fund a 1.7515 BTC withdrawal to bc1q5pxt3falren88z36wp4c4m6xl45mmm0dd6guny ("bc1q5pxt…guny"). This withdrawal occurred in less than one hour from the initial Coinbase withdrawal. Per blockchain.com, this was the only deposit received by bc1q5pxt…guny. Two BTC withdrawals from bc1q5pxt…guny on August 28 and August 30, 2025, brought the balance to zero.

| **Date** | **Receiving Address** | **BTC Amount** |
|---|---|---|
| 08/28/2025 | 16sbcRCa…xNSd | 0.9633 |
| 08/30/2025 | 1MGhTMuX…LjDf | 0.7882 |

Legend:

6sbcRCaWpNg5qrcDbFt8YWdHUGsoExNSd (16sbcRCa…xNSd)

1MGhTMuX2iHXjEhodmvoSBSbaAmDaQLjDf (1MGhTMuX…LjDf)

*16sbcRCa…xNSd Activity*

34. The 0.9633 BTC received in this address was split up and sent to two receiving addresses: 1Cps7qMcWbN9kta9nCXwd4xTQJFBMc8QdA ("1Cps7qMc…8QdA") and 13QBbYQ8Nh7qn5yLwfFh7j3R2R1812Kf4u ("13QBbYQ8…Kf4u") on August 28, 2025, within transaction hash 15253fac62ea00b5b0a6702dca04f214873893fb579cfdc7381a8366a8bcbb8.

35. Based on information provided by HTX, 1Cps7qMc…8QdA is held in VASP HTX account UserID 561105554.

| **Receiving Address** | **BTC Amount** |
|---|---|
| 1Cps7qMc…8QdA | 0.46 |
| 13QBbYQi…Kf4u | 0.50 |

36. The 0.50 BTC sent to 13QBbYQ8…Kf4u funded a withdrawal of 0.49 BTC to 1Cps7qMc…8QdA within transaction hash 8c12d3cf33f248f0620234098d21f16f4d9ba98ced013f7d53ca6b54d840fa43 on August 28, 2025. As noted above, this address is held in an account at HTX.

*1MGhTMuX…LjDf Activity*

37. The 0.7882 BTC received in this address funded a 0.788 BTC withdrawal to 1Cps7qMc…8QdA within transaction hash 836c8e018cb53c94948a46c664f263742e44c254b420a11e0e5b754bae3f2dc3 on August 30, 2025. As noted above, this address is held in an account at HTX.

*HTX Account UserID 561105554 Activity*

38. Per HTX records, this account was created on August 25, 2025, using email address ceshi9922@outlook.com and Chinese identification number 610422199509111745. This account held deposit address 1Cps7qMcWbN9kta9nCXwd4xTQJFBMc8QdA. As of September 3, 2025, the balance in this HTX account was less than $0.01.

39. All three of the BTC deposits, funded by Victim BTC, were converted to tether (USDT) and withdrawn to receiving address TJ1SB5eMBCn8pWvSDLuV3fWXkRHrUxHRM2 (TJ1SB5eM…HRM2) on the Tron blockchain within one hour of the deposit.

| **August 28, 2025 Transactions** | | |
|---|---|---|
| **Description** | **BTC Amount** | **USDT Amount** |
| Deposit | 0.46 | |
| Conversion | -0.46 | 51,950.70 |
| Withdrawal | | -51,950.70 |
| Deposit | 0.49 | |
| Conversion | -0.49 | 55,133.60 |
| Withdrawal | | -55,133.60 |

| **August 30, 2025 Transactions** | | |
|---|---|---|
| **Description** | **BTC Amount** | **USDT Amount** |
| Deposit | 0.788 | |
| Conversion | -0.788 | 85,381.17 |
| Withdrawal | | -42,695.37 |
| Withdrawal | | -42,685.80 |

*TJ1SB5eM…HRM2 Activity*

40. The 51,950.70 USDT was commingled with other USDT and funded a withdrawal of 117,000 USDT on August 28, 2025, to TQXvPRs48XMQV1Ldxg5knTSV6nAMBmpBP6 (TQXvPRs4…pBP6).

41. The 55,133.60 USDT funded a 55,000 USDT withdrawal to TQXvPRs4…pBP6 on August 28, 2025.

42. The 42,695.37 and 42,685.80 USDT were commingled with other USDT and funded a 94,000 USDT withdrawal on August 31, 2025, to TQn1QLUAaEh2TCJSCDbpM8aKesvyVSTdHu (TQn1QLUA…TdHu).

*TQn1QLUA…TdHu Activity on August 31, 2025*

43. The 94,000 USDT deposit funded two withdrawals.

| **Receiving Address** | **USDT Amount** |
|---|---|
| TSgz5o1C…Grjg | 24,900 |
| TVwKHf82…2WGi | 69,000 |

Legend:

TSgz5o1C8zjv2fnurLnbZ72jg7TSnaGrjg (TSgz5o1C…Grjg)

TVwKHf82h5HMonFQuPkUDBYX9omh1i2WGi (TVwKHf82…2WGi)

44. Based on information provided by Binance, TSgz5o1C…Grjg was held in VASP Binance account UserID 76203702.

*TVwKHf82…2WGi Activity on August 31, 2025*

45. The 69,000 USDT deposit funded three withdrawals.

| Receiving Address | USDT Amount |
|---|---|
| TWLnTsMB…HXM3 | 20,000 |
| TZ4dRX5H…Zmjn | 28,611 |
| TNK9UQMp…JuRz | 27,984 |

Legend:

TWLnTsMBTgyoDGhafbKFjr1yhjWnw4HXM3 (TWLnTsMB…HXM3)

TZ4dRX5HAWspgfp1DkmV2JjYMr5eBZZmjn (TZ4dRX5H…Zmjn)

TNK9UQMpnAMKwK8PkDr4jmmDWbNFCXJuRz (TNK9UQMp…JuRz)

*TZ4dRX5H…Zmjn Activity on August 31, 2025*

46. The 28,611 USDT deposit was commingled with other USDT and funded a 43,964.5 USDT transfer to TCHVsG5KncjAh822eWEfP1MkyvFfgssesd (TCHVsG5K…sesd). In less than an hour all 43,964.5 USDT was transferred to TRRxVrZjgaLSWnkMHEPzpQEBSzN818qhBd (TRRxVrZj…qhBd).

47. This 43,964.5 USDT was commingled with other USDT and funded a 92,486.4 USDT transfer from TRRxVrZj…qhBd to TF7MnBgbwTSN4tr7gnTzeABdF3kbrQSEN1 (TF7MnBgb…SEN1) on September 1, 2025. Based on information provided by Binance, TF7MnBgb…SEN1 was held in VASP Binance account UserID 1123171029.

*Binance Activity in UserID 76203702*

48. Based on information provided by Binance, this account was held under the name of Ubaid Ur Rehman Jameel Ahmed with email ubaid_rehman_007@hotmail.com and phone +971506445305. This account held deposit address TSgz5o1C8zjv2fnurLnbZ72jg7TSnaGrjg and received the 24,900 USDT deposit listed above. However, the balance in this Binance account was less than $1,000 USD as of September 30, 2025, due to the USDT being withdrawn.

49. This account received three USDT deposits, totaling 65,000 from August 30, 2025 to September 3, 2025. All of the 65,000 USDT was transferred to Binance UserID 1125935657 holding deposit address TGSNN25pepzkLFPJjpnDm9uHZvKpD3UXr5.

*Binance Activity in UserID 1125935657*

50. Based on information provided by Binance, this account was held under the name of Russel John Wheatley with email russelle1974@gmail.com and South Africa ID number 7403095363080. This account held deposit address TGSNN25pepzkLFPJjpnDm9uHZvKpD3UXr5 and received the 65,000 USDT sent out via three transfers from Binance UserID 76203702, listed above. Specifically, 24,500 USDT tied to Victim funds was sold for 0.2739 BTC.

51. As of October 9, 2025, this Binance account held a balance equivalent to $206,779 USD.

*Binance Activity in UserID 1123171029*

52. Based on information provided by Binance, this account was held under the name of Khoo Lai Heng with email laiheng5445@gmail.com and phone +60178184779. This account held deposit address TF7MnBgbwTSN4tr7gnTzeABdF3kbrQSEN1 and received the 92,486.4

USDT transfer listed above. The USDT was swapped for ldusdt, a Binance token created for margin future trading, and then swapped back to USDT within four hours of the initial deposit.

53. As of October 17, 2025, this Binance account held a balance equivalent to $788,157 USD.

Chart 1:


Tracing crypto from victim account to Binance
Victim
Owner
Crypto Exchange
1.5816 btc
08/28/2025
bc1q7wg4...tafg
1.5816 btc
bc1qy3...ac8d
1.7515 btc
bc1q5p...guny
0.9633 btc
08/28/2025
16sbcR...xNSd
0.503 btc
0.46 btc
08/28/2025
13Q8bY...Kf4u
0.49 btc
08/28/2025
0.7882 btc
08/30/2025
1MGhTM...LjDf
0.788 btc
08/30/2025
All btc was converted to usdt in HTX account and transferred out on the Tron blockchain
User ID 561105554
Owner
HTX
Crypto Exchange
192,465 usdt
8/28 - 8/30
TJ1SB5...HRM2
172,000 usdt
TQXvPR...pBP6
94,000 usdt
08/31/25
TQn1QL...TdHu
24,900 usdt
08/31/2025
U. Ahmed
Owner
Binance
User ID 76203702
24,500 usdt
R. Wheatley
Owner
Binance
User ID 1125935657
69,000 usdt
TVwKHf...2WGi
28,611 usdt
08/31
TZ4dRX...Zmjn
27,984 usdt
TNK9UQ...JuRz
20,000 usdt
TWLnTs...HXM3
43,964.5 usdt
TCHVsG...sesd
43,964.5 usdt
08/31/25
TRRxVr...qhBd
92,486.40 usdt
09/01/25
K. Heng
Owner
Binance
User ID 1123171029

54. In short, funds/virtual currencies received from the Victim was transferred through multiple addresses, including changes from one type of virtual currency to another. Although these transfers were made across many deposit addresses, the addresses listed in Chart 1 each received funds traceable to the Victim described above.

55. Based on SA Schmitt's training and experience, he knows that this type of activity is indicative of common control or a planned disposition of those funds.

56. From those accounts, virtual currencies were transferred into accounts at Binance/Nest, including the Binance/Nest Accounts ending in 5657 and 1029. Tracing and blockchain analysis reveal that the Binance/Nest Accounts ending in 5657 and 1029 each received proceeds traceable to the accounts that received Victim payments through transfers and exchanges of such funds through various digital addresses.

57. Based on SA Schmitt's training and experience, he knows this behavior—i.e. the transferring and exchange of different virtual currencies across multiple addresses in an apparently-coordinated manner—is evidence of a coordinated effort to transfer or transmit proceeds of a specified unlawful activity ("SUA")—namely, wire fraud, in order to conceal or disguise the nature, location, source of ownership or control of those SUA proceeds. Routing proceeds of more than one victim's purported investments through the same digital address would be a very unlikely event absent coordination.

58. In addition, based on SA Schmitt's training and experience, he knows the exchange of different types of virtual currencies in conjunction with the transfer of fraud victim funds is indicative of an attempt to complicate the tracing of those funds and hide their source, nature and ownership, among other things. Other similarities, including the routing of these

funds to Binance/Nest, as well as the movement of an unusually large volume of virtual currency, add support to the conclusion that the Binance/Nest Accounts ending in 5657 and 1029 are being used to launder proceeds of wire fraud.

59. The use of the Binance/Nest Accounts ending in 5657 and 1029 are consistent with their involvement in a widespread and large-scale money laundering scheme of wire fraud proceeds.

60. As a result, there is probable cause to believe that the Binance/Nest Accounts ending in 5657 and 1029 were involved in, and were being used to facilitate, a money laundering scheme through which the proceeds of wire fraud schemes were being laundered.

61. On or about November 6, 2025, FBI secured a properly authorized federal seizure warrant for the Binance/Nest Accounts ending in 5657 and 1029. On November 7, 2025, FBI executed this seizure warrant.

62. The Defendant Property was located in the seized Binance/Nest Account ending in 5657.

**Claim for Relief**

WHEREFORE the United States of America prays the Defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the Defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the Defendant property; and for such other and further relief as this Court may deem just and equitable.

UNITED STATES OF AMERICA,
Plaintiff

LESLEY A. WOODS
United States Attorney

By: s/ Mikala Purdy-Steenholdt
MIKALA PURDY-STEENHOLDT
(NY#5112289)
Assistant U.S. Attorney
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
Tel: (402) 661-3700
Fax: (402) 345-5724
E-mail: Mikala.Purdy-Steenholdt@usdoj.gov